**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00575-PAB

COLORADO ex rel. Julie Ann Meade, Administrator,
Uniform Consumer Credit Code,

    Plaintiff,

v.

MARLETTE FUNDING LLC
d/b/a BEST EGG,

    Defendant.

_____

**BRIEF OF *AMICUS CURIAE* THE MARKETPLACE LENDING ASSOCIATION IN
SUPPORT OF DEFENDANT MARLETTE FUNDING LLC**
_____

## STATEMENT OF *AMICUS CURIAE*[1]

The Marketplace Lending Association ("MLA") is an association of nineteen organizations operating in the marketplace lending industry.[2] The MLA's goal is to promote a transparent, efficient, and customer-friendly financial system by supporting the responsible growth of marketplace lending platforms, fostering innovation in financial technology, and encouraging sound public policy. To that end, the MLA limits its membership solely to those marketplace platforms ("MPPs") that meet its standards of safety and responsibility towards consumers and the overall marketplace. To gain membership in the MLA, platforms must (i) have at least one year of operating history; (ii) be transparent with consumers about annualized interest rates, penalties, and fees, by disclosing them up front and in plain English; (iii) not offer so-called "payday" or high-cost installment loans (loans to consumers must be made at less than 36% APR); and (iv) adhere, in facilitating loans to small businesses, to the Small Business Borrowers' Bill of Rights or equivalent standards. *Small Business Borrowers' Bill of Rights*, RESP. BUS. LENDING COAL. (2015), http://www.responsiblebusinesslending.org.

The MLA, on behalf of its members, has a strong interest in the questions presented in this case. MLA members facilitating responsible lending in Colorado would be significantly impacted should this case result in a determination that MPPs may not rely on their bank partners

---

[1] The undersigned counsel for *amicus curiae* certify that: (1) no counsel for a party authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (3) no person or entity—other than amicus curiae, its members, and its counsel—contributed money intended to fund the preparation or submission of this brief.

[2] Marlette Funding, LLC ("Marlette") is a member of MLA, but did not participate in the drafting of this brief.

to originate loans to consumers in Colorado that can then be sold, as such strategic bank partnerships are an inherent component of the MLA members' business models. In structuring and developing their technology and products, MLA members rely on firm judicial precedent establishing that both FDIC-insured banks and national banks may originate loans with assistance from a marketplace platform and sell loans to third parties, such as MPPs, whereupon such third parties can service and collect on those loans, pursuant to the original terms of the loans. Members of the MLA include both publicly held and privately held companies, and investors have invested billions of dollars in these platforms, their technologies, and capabilities, in reliance on this federal precedent. The result is greater choice and transparency for consumers and small businesses seeking access to credit on fair terms.

The Administrator's lawsuit challenges this long-standing federal precedent, with the potential to disrupt the foundation of the marketplace lending industry. A finding that disregards the federal rights of MPPs' bank partners would detrimentally impact consumers in Colorado, as well as nationally, by creating inconsistencies across the states and preventing effective pricing on a national scale, further restricting access to credit for underserved consumers and small businesses, and upending expectations in the secondary market. Furthermore, as this case involves a fundamental question regarding an FDIC-insured state-chartered bank's well-established right to engage in rate exportation across state lines pursuant to Section 27 of the Federal Deposit Insurance Act, the lawsuit challenges important principles of federal preemption. Thus, the MLA urges the Court to deny the Motion to Remand for Lack of Subject Matter Jurisdiction ("Motion to Remand").

## INTRODUCTION

The bank partnership model plays a vital role in the marketplace lending industry and adheres to longstanding federal and state regulatory practice. The Administrator of Colorado's Uniform Consumer Credit Code (the "Administrator") seeks to upend years of precedent to significantly disrupt an evolving market by claiming that a state-chartered, federally insured and regulated bank's right to export home-state interest rates under federal law should be limited because of the bank's partnership with non-bank third parties. *Amicus curiae* MLA urges the Court to find in favor of the bank partnership model.

This case involves one important form of marketplace lending, which is known as bank-affiliated marketplace lending. In this arrangement, the MPP partners with a traditional FDIC-insured state-chartered bank.  The MPP helps market loans and process loan applications and the bank originates and funds the loan.  Although the characteristics of each individual relationship differ, the loan is generally later purchased by the MPP from the bank, and held in the MPP's portfolio or sold to an investor.  Using this model, MPPs and banks work together to offer a variety of products, including consumer and student loans, small business loans, equipment financing, and lines of credit. *See* U.S. DEP'T OF TREASURY, OPPORTUNITIES & CHALLENGES IN ONLINE MARKETPLACE LENDING (2016).

## ARGUMENT

MPPs serve an important role in the consumer and small business credit markets, and many MPPs operate through bank partnerships. An adverse decision by this Court could limit operation of MPP-bank partnerships, which would (i) constrain the availability of credit to consumers and small businesses, in Colorado and nationwide, including those underserved by the

traditional banking framework; (ii) disrupt an innovative financing model that is founded on long-standing banking principles and facilitates liquidity, capital, and a robust secondary market; and (iii) interfere with federal regulatory oversight of MPPs and their bank partners.

### I.  Marketplace Lending Bank Partnership Models Rely on Well-Established Federal Preemption Principles.

The financial system and capital markets, including institutional participants, rely heavily on federal laws and the consistency they offer, which allow consumers access to the best financial products and services at rates that work best for them. The MLA and its members understand the importance of each state's regulatory regime, and take steps to comply with these regulations, but the variability of these requirements imposes significant burdens on companies wishing to provide access to credit to borrowers nationwide.

The long-standing federal preemption and regulatory framework first arose more than 150 years ago with the National Bank Act ("NBA") in 1864. 12 U.S.C. § 85. Under the NBA, courts, including the United States Supreme Court, have determined that national banks may charge higher interest rates than those permitted to be charged by state banks. *See, e.g.*, *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29 (1875); *Nat'l Exch. Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409 (1874); *Bank v. Moore*, 17 F. Case. 1211 (1868). The NBA permits a national bank to export its home-state interest rate to any state where it does business. *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978) (rejecting argument that extending credit into state effectively located bank there).

Federal preemption is not limited to national banks. In 1980, Congress similarly authorized FDIC-insured state-chartered banks to export rates authorized by the bank's home state to borrowers in other states. 12 U.S.C. § 1831d (Section 521 of the Depository Institutions

4

Deregulation and Monetary Control Act, codified as Section 27 of the Federal Deposit Insurance Act). As emphasized in FDIC guidance, Section 27 permits state-chartered FDIC-insured banks to export interest rates in a similar manner as that permitted for national banks. *See, e.g.*, Kathy A. Johnson, FDIC Advisory Letter, FDIC-81-7 [1988-89 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 81,008 at 55,110 (Mar. 17, 1981); Douglas H. Jones, FDIC Advisory Letter, FDIC-92-47 [Current] Fed. Banking L. Rep. (CCH) ¶ 81,534 at 55,730-31 (July 8, 1992). Section 27 expressly preempts state constitutions and statutes. *Compare* 12 U.S.C. § 85 ("may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located")), *with* 12 U.S.C. § 1831d(a) ("may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate … where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located"). In addition to rate exportation under Section 27, the FDIC also permits "most favored lender" status, which allows banks to charge the highest rate available to any lender under a given state's laws. *See, e.g.*, Frank L. Skillern, Jr., FDIC Advisory Letter, FDIC-81-3 [1988-89 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 81,006 at 55,107 (Feb. 2, 1981).

Rate exportation has played a fundamental role in the provision of credit to consumers across the United States. The most well-known use of rate exportation is for credit cards, whereby banks may lend easily to consumers across state lines, without establishing a physical

presence in every state.[3] Marketplace lending builds on this established concept, facilitating lending by state-chartered FDIC-insured banks, which use rate exportation to create a consistent, national, easily accessible, consumer-friendly online loan program, with an emphasis on user experience, faster application decision-making, and reduced costs.[4]

## II. The Marketplace Lending Industry Serves an Important Role by Partnering with Banks to Minimize Costs and Increase Access to Credit.

Access to credit in the U.S. remains inconsistent.  Rapid changes in the economy often harm underserved communities the most. *See* FDIC, NATIONAL SURVEY OF UNBANKED AND UNDERBANKED HOUSEHOLDS 1 (2015). The FDIC estimated that as of 2015, 28% of American households were unbanked or underbanked. *Id.* Underbanked or underserved customers have indicated that traditional banks are not providing financial products or services specific to their needs, and they are therefore more likely to turn to predatory lending for credit. *Id.* at 60. The

---

[3]   Courts have upheld bank partnerships in other contexts.  For example, consumers can obtain branded financing at many department stores and major retail outlets.  The retailer facilitates the origination, but the bank originates the loan.

[4]   In several cases, plaintiffs and regulators have challenged lending programs, claiming that an entity other than the named lender should be viewed as the "true lender." In a case filed against a program involving WebBank, the federal district court rejected that claim, concluding that WebBank was the "true lender." *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1370 (D. Utah 2014). The *Sawyer* court looked at a variety of factors, including the fact that the program was subject to extensive regulation as a result of WebBank's status as the lender. The Fourth and Eighth Circuits have also rejected true creditor challenges, concluding that a bank was the true creditor when it (1) set the terms and conditions of a loan, and (2) actually extended credit to the consumer. *Discover Bank v. Vaden*, 489 F.3d 594, 597 (4th Cir. 2007), rev'd on other grounds 556 U.S. 49 (2009); *Krispin v. May Department Stores Co.*, 218 F.3d 919, 923 (8th Cir. 2000). Moreover, the U.S. Solicitor General and the OCC have confirmed that assignees purchasing loans from banks are entitled to collect interest on those loans at the rates contracted for by the banks, even when the assignees are not banks themselves. Br. *Amicus Curiae* of United States, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at *8 (U.S. May 24, 2016).

Federal Reserve Bank of New York ("FRBNY") recently reported that unmet credit demands are sharply increasing, particularly in already underserved demographics. FRBNY, CENTER FOR MICROECONOMIC DATA, SCE CREDIT ACCESS SURVEY (2017). In 2015, a study by the FRBNY showed that only half of small businesses (those with fewer than 500 employees) surveyed were approved for the full amount of financing they requested from a lender. FRBNY, SMALL BUSINESS CREDIT SURVEY: REPORT ON EMPLOYER FIRMS 13 (2015).

The rapid growth of marketplace lending has changed the financial services marketplace in the past decade. In addition to the MPPs' own streamlined technology operations, MPPs' strategic bank partnerships with FDIC-insured state-chartered banks enable them to leverage each other's expertise, maximize synergies, and effectively expand access to underserved individuals and communities as well as new borrowers, all under extensive federal regulatory supervision. From 2013 to 2015, MPP-partnered originations by banks increased nearly six-fold to approximately $29 billion. OCC, SEMIANNUAL RISK PERSPECTIVE 18 (2016).

These loans have acted as a safe and sound alternative means to access credit, especially as compared to payday or credit card loans, which are riskier and carry significantly higher interest rates than those of traditional bank loans. At the same time, traditional bank loans are often inaccessible for consumers and small businesses who turn to MPPs. As the Consumer Financial Protection Bureau ("CFPB"), Office of the Comptroller of the Currency ("OCC"), and others have noted, "[f]or small and medium enterprises or higher risk consumer credit lending, [m]arketplace lenders can provide an alternative for clients often under-served by traditional banks." CITI GLOBAL PERSPECTIVES & SOLUTIONS, DIGITAL DISRUPTION 12 (2016); *see also* Thomas J. Curry, Comptroller, OCC, Remarks at the LendIt USA Conference (Mar. 6, 2017),

https://www.occ.treas.gov/news-issuances/speeches/2017/pub-speech-2017-27.pdf; Richard Cordray, Director, CFPB, Remarks at the LendIt USA Conference (Mar. 6, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-lendit-usa-conference/; FRBNY (2015), *supra*, at 6 (small businesses that were denied traditional financing were more likely to apply for financing from MPPs).

MPPs are enabling borrowers from underserved areas, such as rural locations that have seen uneven economic gains following the most recent recession, to apply for products that have less than a 36% APR. Bank-affiliated MPPs allow these borrowers to obtain credit without driving miles to the nearest bank branch, where they may have to wait hours for a decision or be forced to return to the branch another day. Furthermore, MPPs provide credit to borrowers with "thin" credit files, including lower incomes and credit scores, who demonstrate the ability to improve their credit quality in the near future, with the ability to consolidate debt from credit cards or student loans into transparent installment loans, often at lower interest rates. *See* U.S. DEP'T OF TREASURY, *supra*.

To its credit, Colorado has been at the forefront of payday lending reform by instituting longer repayment terms and the ability-to-repay for such borrowers. *See* COLO. REV. STAT. § 5-3.1-108(5) (2017); *see also, e.g.*, CFPB, PAYDAY LOANS AND DEPOSIT ADVANCE PRODUCTS 8-9 (2013); Payday, Vehicle Title, and Certain High-Cost Installment Loans, 81 Fed. Reg. 47,864 (proposed July 22, 2016) (to be codified at 12 C.F.R. pt. 1041). However, unlike high-interest, high-risk payday loans, which typically carry annual percentage rates of 300-500%, the loans provided to consumers through the MPP-bank partnership model are subject to direct federal

supervision and regulation by the FDIC, and provide a significantly safer and less risky product for borrowers, enhancing their ability to obtain credit and to repay it.

### III. Applying State Law Interest Rate Limits to Bank Loans Facilitated by MPPs Would Have Significant Consequences for Consumer Lending.

Applying state interest rates to loans made by banks and facilitated by MPPs would not have the intended effect of reducing the interest rates charged to borrowers based on the usury limits of the particular state. Instead, the result would be to reduce the availability of such loan products nationwide.

#### A. Subjecting bank loans facilitated by MPPs to state rate caps will create obstacles for consumers seeking to reduce high-interest debt.

Since 2010, MPPs have been able to assist consumer debtors saddled by burdensome credit card rates by enabling those consumers to access loans that, on average, have lower rates than credit cards. *See* Yuliya Demyanyk & Daniel Kolliner, *Peer-to-Peer Lending Is Poised to Grow*, FED. RES. BANK OF CLEVELAND (Aug. 14, 2014). If bank-affiliated MPP loans are limited by interest rate restrictions in every state in which MPPs do business, rather than bank-affiliated MPPs being able to rely on the rates that governed the bank's origination of the credit, many consumers will lose the benefit of access to competitive credit card refinancing.[5]

---

[5] The consumer credit card debt industry is the fourth largest source of consumer debt. *See* CFPB, THE CONSUMER CREDIT CARD MARKET 240 (2015). Credit cards are typically issued by national banks that engage in rate exportation to deliver billions of dollars of loans annually to consumers in excess of state interest rate caps. *See generally Marquette Nat'l Bank of Minneapolis*, 439 U.S. 299. Credit card rates have remained persistently high, despite new regulations governing interest rates applicable to consumer credit card accounts. CFPB (2015), *supra*, at 75; *see also, e.g.*, 15 U.S.C. § 1665c (2012).

The results of applying state interest rate caps to bank loans made in connection with a marketplace lending partnership would not only be contrary to rights created under federal law, it would detrimentally impact consumers. By way of illustration, in Colorado, for example, licensed lenders may not make loans in excess of 21% APR. That means that a Colorado consumer saddled with credit card debt at 28% APR (allowed pursuant to rate exportation) would not be able to refinance that same debt with a simple installment loan at 22% APR from a bank partnered with an MPP. Currently, large credit card–issuing national banks have little incentive to offer consumers personal installment loans, as such loans typically reduce the profitability of the banks' own credit card products.

### A. An adverse holding would upend expectations in the secondary market in marketplace lending and beyond.

Bank-affiliated MPPs have opened up financing to new and diverse sources of capital, providing a channel for individuals and institutions who are interested in investing in the loans made to consumers, small businesses, students, and real estate projects. With an estimated $28.6 billion in loans originated, "[a]bout $6.6 billion in asset-backed securities supported by marketplace loans were originated in 2015, contributing to a cumulative $8.2 billion in such asset-backed securities to date." OCC, *supra*, at 18. Beyond marketplace loans, non-bank investors in the United States buy tens of billions in bank-originated loans annually—including credit card receivables—with full confidence that the loans made above state rate caps cannot be invalidated simply because the MPP-bank partner originated those loans or they were sold by the bank to a third party.

Withdrawal of federal preemption could force investors to choose between time-consuming and expensive due diligence or liability for servicing loans according to the

originating terms, a decision that "runs the risk of freezing secondary markets." Michael Marvin, Note, *Interest Exportation and Preemption: Madden's Impact on National Banks, The Secondary Credit Market, and P2P Lending*, 116 COLUM. L. REV. 1807, 1837 & n.185 (2016). Such a finding could trigger a significant price correction on the secondary market, as investors would face increasing risk of unenforceability of these loans and risk of potential usury liability.[6]

Additionally, if an FDIC-insured state-chartered bank is unable to fully assign loan agreements to third parties, it would create significant uncertainty at the time of the origination of debt, including for secondary market participants. For the parties engaged in the market, this would restrict their ability to engage in third-party lending relationships, as well as their ability to sell loans to comply with federal liquidity and capital requirements. *See, e.g.*, 12 C.F.R. § 325.1 (noting that the FDIC must evaluate capital to determine the safety and soundness of the state nonmember banks it insures and supervises).

## IV. Existing Regulatory Oversight Is Sufficient to Ensure that Marketplace Lending Products Are Fair, Safe, and Beneficial to Consumers.

The marketplace lending industry is subject to substantial regulatory oversight, and MPPs have consistently and proactively engaged with regulators to set and abide by safe practices. Congress, through the Bank Service Company Act, has formally addressed FDIC-insured state-

---

[6] Other research related to *Madden* has indicated that the decision potentially has impacted investors' perceptions of their ability to collect on loans made to borrowers in New York, Connecticut, and Vermont. *See* Colleen Honigsberg, Robert J. Jackson, Jr., & Richard Squire, What Happens when Loans Become Legally Void? Evidence from a Natural Experiment (Dec. 2, 2016) (unpublished manuscript), https://www-cdn.law.stanford.edu/wp-content/uploads/2017/04/Honigsberg_et_al_12.7.2016.pdf.

chartered banks' relationships with third parties, such as MPPs, by granting the FDIC the authority to "subject to examination and regulation" third parties, including MPPs, "to the same extent" as the banks to which they provide such services. 12 U.S.C. § 1867(c)(1).

The FDIC has also articulated guidance to banks on managing risks related to contracting with third parties, such as MPPs. Through long-standing regulatory guidance, the FDIC has recognized that banks engage in third-party relationships in order to facilitate certain operations or provide for products and services that are not offered by the institution itself. *See* FDIC, Guidance for Managing Third-Party Risk, FIL-08-044 (June 4, 2008). The FDIC recently updated this guidance to address the changing landscape of marketplace lending, and recognized that third-party lending, such as that through MPPs, may "enable institutions to lower costs of delivering credit products and to achieve strategic or profitability goals." FDIC, Proposed Examination Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016). Ongoing compliance is a necessary component of the marketplace lending model, and MPPs are subject to stringent contractual and compliance obligations with respect to their bank partnerships, in addition to regulatory and consumer protection requirements imposed directly on the banks by the FDIC and other relevant federal authorities. *Id.*[7] In addition to federal consumer protection regulations, state regulations, including those under the Colorado Uniform Consumer Credit

---

[7] The CFPB also has broad authority to issue regulations, supervise and otherwise set standards governing the marketplace lending industry, and has the authority to take enforcement actions for unfair, deceptive, or abusive acts or practices in which nondepository institution covered persons have engaged. 12 U.S.C. §§ 5514, 5531, 5536. The term "covered person" under Title X of the Dodd-Frank Act is "any person that engages in offering or providing a consumer financial product or service" and any affiliate thereof. *Id.* § 5481(6).

Code, also pay a role in ensuring that marketplace loans are extended to borrowers in a fair and responsible manner, such as through enforcement of laws prohibiting unfair or deceptive acts or practices ("UDAP"), fair lending, and debt collection. *See, e.g.*, COLO. REV. STAT. § 5-3.1-121 (UDAP); *id.* § 5-3-210 (anti-discrimination); *id.* § 5-5-109 (debt collection).

Finally, in recognition of the extraordinary benefits that marketplace lending can offer to consumers, federal banking regulators have increased their efforts to welcome MPPs into the national banking system. For example, the Department of Treasury published a report in 2016 noting the important benefits the industry offers to consumers. *See* U.S. DEP'T OF TREASURY, *supra*, at 6. In 2016, the OCC also proposed a special-purpose bank charter that would be applicable to MPPs. OCC, EXPLORING SPECIAL PURPOSE NATIONAL BANK CHARTERS FOR FINTECH COMPANIES (2016).

## CONCLUSION

For the foregoing reasons, the MLA requests that this Court uphold long-standing principles of federal preemption for banks and third-party service providers such as MPPs, and deny the Administrator's Motion to Remand.

\* \* \*

DATED: April 28, 2017

                        Respectfully submitted,

                        DEBEVOISE & PLIMPTON LLP

                        s/ Courtney Dankworth
                        Courtney Dankworth
                        Naeha Prakash
                        Alexandra Mogul
                        Debevoise & Plimpton LLP
                        919 Third Avenue
                        New York, NY 10022
                        Telephone: (212) 909-6758
                        Facsimile: (212) 521-7358
                        cmdankwo@debevoise.com


                        KITTREDGE LLC

                        s/ Daniel Domenico
                        Daniel D. Domenico
                        3145 Tejon Street, #D
                        Denver, CO 80211
                        Telephone: (720) 460-1432
                        ddomenico@kittredgellc.com

                        Attorneys for *Amicus Curiae*
                        The Marketplace Lending Association