**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Nos. 1:17-cv-00575-PAB-MJW

COLORADO *ex rel.* Julie Ann MEADE, Administrator,
Uniform Consumer Credit Code,

      Plaintiff,

v.

MARLETTE FUNDING LLC d/b/a BEST EGG,

      Defendant.

---

**Marlette's Reply in Support of its Motion to Dismiss (ECF No. 38)
Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 5)**

---

This case belongs in federal court rather than state court because the Administrator's complaint is completely preempted—as set forth in the briefing on the Administrator's motion to remand. Once jurisdiction is resolved, however, the Administrator may proceed in federal court only by recasting her action as one under Section 27(b) of the FDIA, 12 U.S.C. § 1831d(b), the sole federal cause of action that Congress permits for challenging a state-chartered bank's interest rates. Because the Administrator fails even to argue, let alone to show, that she could recast her complaint as one under Section 27, her Opposition confirms that she cannot state a valid claim for relief, and so the Court should dismiss her complaint under Rule 12(b)(6).

Rather than explain how she states a claim under Section 27, the Administrator reargues her remand motion. The Administrator contends that mere allegations that Marlette Funding, LLC ("Marlette") is the "true lender" create an issue of fact. But whether Marlette is the "true lender" is an issue of federal law, which provides that Cross River Bank is the lender. The Administrator's only other argument is that, if Cross River Bank is the "true lender," Marlette cannot invoke the

federal interest-rate protections that apply to loans made by Cross River Bank. But that ignores the plain language of 12 U.S.C. § 1831d ("Section 27") and the valid-when-made rule. Because the Amended Complaint does not state a federal claim, it must be dismissed.

## ARGUMENT

### I. The Administrator's Preempted Action Should Be Dismissed Because The Administrator Nowhere Attempts To State A Claim Under Section 27(b).

When, as here, federal law completely preempts a complaint that nominally presents a state-law claim, two outcomes are possible. Plaintiff can refashion its complaint to state a claim under the federal cause of action that Congress provided, in which case the complaint may proceed in federal court, or plaintiff cannot do so, in which case the complaint must be dismissed under Rule 12(b)(6).

By not even attempting to state a claim under Section 27(b), the Administrator concedes that she cannot survive a Motion to Dismiss. While the Administrator cites various ERISA cases in which a complaint is not dismissed after finding complete preemption, such cases are of no aid. They either involve allegations that can be recast under the federal cause of action, *see David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1139 (10th Cir. 2005), which the Administrator cannot do here, or involve issues of fact that bear on the *federal* cause of action, which the Administrator has not alleged. Where, as here, Congress has completely preempted a state law claim, a plaintiff's inability to state a claim under the exclusive federal cause of action requires dismissal.

### II. The Administrator's "True Lender" Allegations Do Not Preclude Dismissal.

In opposing Marlette's Motion to Dismiss, the Administrator advances arguments that bear only upon complete preemption. None has merit.

#### A. The Administrator's "True Lender" Test Is Inconsistent with Federal Law.

The text and history of Section 27 foreclose the Administrator's argument that a bank must

first satisfy a state-law "true lender" test before availing itself of the complete preemptive power of federal law. Section 27(a) preempts state interest-rate caps not just to any loan *held* by a state-chartered bank, but to any "any loan . . . *made*" by such a bank. 12 U.S.C. § 1831d(a) (emphasis added). Thus, under federal law, and as the only court within the Tenth Circuit to address this issue has held, the sole relevant inquiry Section 27 permits as the threshold for preemption requires "look[ing] to the originating entity (the bank) in the arrangement, and not the ongoing assignee." *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1367 (D. Utah 2014) (construing *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000)). If the originating entity is a bank, Section 27 applies and state law is preempted no matter how "insignificant" a role the bank plays after origination. *Id.*

Here, the Administrator concedes that "Cross River Bank originates loans identified by Marlette," Opp. at 5, and does not even attempt to contest the validity of the loans that Cross River Bank continues to hold. As a matter of law, therefore, all of the loans at issue fall within the category of "any loan[s] or . . . other evidence of debt" under Section 27 and state law is preempted.

Requiring Marlette and Cross River Bank to satisfy a state-law-based true-lender test before applying federal law would conflict with federal law. In the related context of preemption for "branch bank" affiliates of national banks, for instance, the Supreme Court rejected the attempted imposition of "state law definitions of what constitutes 'branch banking,'" on the ground that "to allow the States to define the content of the term 'branch' would make them the sole judges of their own powers"—a result that was impermissible under federal law. *First Nat'l Bank v. Dickinson*, 396 U.S. 122, 133-34 (1969). The same analysis governs here. *See Sawyer*, 23 F. Supp. 3d at 1367-68.

The Administrator cites cases that raise a "true lender" issue where the relationship between a bank and the purchaser is a "sham," *see* Opp. at 3-4, but those are extreme cases that have no

3

application here. The Administrator leads with a citation to *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1259-60 (11th Cir. 2011), but that case held only that there might be jurisdiction to compel arbitration based on plaintiff's hypothetical ability to "navigate [a] narrow legal path" and "non-frivolous[ly]" state a RICO claim based on a "sham" conspiracy where a payday lender used a bank's name to conduct its business—allegations that the court acknowledged would "not in the end [be] meritorious." *Id.* Likewise, in *Ubaldi v. SLM Corp.,* 852 F. Supp. 2d 1190 (N.D. Cal. 2012), the plaintiff's "true lender" allegations survived a motion to dismiss only because the court applied a pre-*Twombly* test that permitted suits to advance if they asserted "novel or extreme" theories and because the plaintiff alleged that the bank had not either funded or held the loan for any period of time. *See id.*; *Sawyer*, 23 F. Supp. 3d at 1369-70 (distinguishing *Ubaldi*). Similarly, *Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, (E.D. Pa. Jan. 14, 2016), did not discuss "true lender" in considering Section 27, and the portion of the decision that *did* discuss a "true lender" theory involved a scheme where a lender that had been issuing loans at 300-percent interest tried to avoid a new rate cap by arranging with local Indian Tribes to use their names and tribal lending laws (and not Section 27) to keep making loans at the same rates. *See id.* at \*11. Moreover, both *Think Fin., see id.* at \*13, and *CFPB v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at \*5 (C.D. Cal. Aug. 31, 2016), noted that *Sawyer* would require a different result.

None of the cases the Administrator's cites addresses the plain "any loan . . . made" language of Section 27. That alone suffices to distinguish them. Beyond that, the Administrator's cited authorities do not account for the valid-when-made rule or the Comptroller of the Currency's reinforcement of that rule's application to preemption. *See* Br. *Amicus Curiae* of United States, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at \*8 (U.S. May 24, 2016). The

4

valid-when-made rule also is irreconcilable with a "true lender" exception to preemption. In the *Madden* brief, the Solicitor General explained that "[t]he power explicitly conferred [by statute] to originate loans at the maximum interest rate allowed by the . . . bank's home State . . . therefore carries with it the power to use the loans once originated for their usual commercial purposes, *which include assignment of such loans to others*." *Id.* (emphasis added). Thus, any test that would thwart a bank's protected power to make and sell loans is inconsistent with Section 27 and must be rejected. The Administrator cites cases that, unlike *Sawyer*, do not account for that rule, and therefore are inapt.

The "true lender" test the Administrator proposes, moreover, is not limited to just "shams" where the bank plays no role. Indeed, the Administrator contends that—no matter how a bank set up a loan program—merely accusing it of not being the true lender would defeat preemption and permit a state-law assault on loans that Congress expressly protected. But, under the Supremacy Clause and Section 27, the Administrator may not be the "sole judge of [her] own powers." *First Nat'l Bank,* 396 U.S. at 133-34.

Even giving weight to the Administrator's concern that Section 27's text may allow for arrangements that are "designed for the sole purpose of circumventing [state] usury law," *Sawyer*, 23 F. Supp. 3d at 1367, it does not follow that state law must provide the remedy. Congress authorized the FDIC to regulate state-chartered banks and their relationships with third parties for their compliance with federal law, and the FDIC approves of those relationships without regard to how long the bank holds the loans before selling them or how much interest the bank retains after selling them. *E.g.,* Guidance for Managing Third-Party Risk, FIL-08-044 (June 6, 2008). As the *Sawyer* Court held, "concerns about protection of state usury laws present questions of legislative policy better addressed by Congress." *Id. see A.F. ex rel. Christine B. v. Espanola Pub. Sch.*, 801 F.3d 1245,

1249 (10th Cir. 2015) (Gorsuch, J.) ("[I]t is . . . very rare . . . for courts to dismiss the results dictated by Congress's plain statutory command on the ground they are implausible as a matter of 'policy.'").

Finally, other provisions of federal law that authorize banks to sell their loans reinforce the absence of a "true lender" exception. Section 1867 of the Bank Service Company Act permits banks to contract out for services and subjects its partners to "examination by [an] agency *to the same extent as if such services were being performed by the depository institution itself.*" 12 U.S.C. § 1867(c) (emphasis added); *accord Sawyer*, 23 F. Supp. 3d at 1368 (recognizing that Section 1867 reinforces that loans meet "the definition of 'any loan' under Section 27"). Section 1867 is not limited to arrangements where the bank holds the loans for a certain period or retains the "predominant economic interest." And, under TILA, 15 U.S.C. § 1601 *et seq.*, Cross River Bank is the lender no matter how it treats the loan after sale. *See* 15 U.S.C. § 1602(g); 12 C.F.R. pt. 1026, Supp. I, Comment 2(a)(17)(i)-2.

### B. Dismissal Is Appropriate Even If A "True Lender" Test Were Imposed Here.

The Administrator's "true lender" contentions also fail to create an issue of fact. The facts as alleged are sufficient to hold that Cross River Bank—not Marlette—is the lender. The authorities that suggest a "true lender" exception deal with circumstances where the bank is "the lender in name only," *Ubaldi,* 852 F. Supp. 2d at 1203, or where the relationship is a "sham," *Cmty. State Bank*, 651 F.3d at 1259-60. But the Administrator makes no such allegations here. To the contrary, aside from the Administrator's conclusory assertions that Marlette is the true lender—which this Court should disregard, *see Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)—the Administrator's factual allegations about Marlette and Cross River Bank's arrangement are weaker than those raised in *Sawyer*, which were held legally insufficient to support a "true lender" challenge. 23 F. Supp. 3d at 1368-70. In distinguishing the same cases the Administrator cites, *Sawyer* held that an FDIC-insured

bank, like Cross River Bank, that contracted with consumers, funded the loans, held the rights to the receivables for two days, and participated in the performance of the loans, is the "true lender" under any test. *Id.* Also, contrary to the Administrator's suggestion that Cross River Bank bears no risk, *see* Opp. at 5, Cross River Bank retains a number of loans it originates and maintains an ongoing stake even in loans it sells, and also bears the ultimate risk of regulation on these loans.[1] These factors show that Cross River Bank, not Marlette, is the lender. *Sawyer*, 23 F. Supp. 3d at 1369.

### III. Section 27's Complete Preemption of State Interest-Rate Laws Protects Cross River Bank's Power to Sell Loans to Marlette.

The Administrator alternatively contends that, even if Cross River Bank is the "true lender," its Complaint against Marlette should not be dismissed because Marlette cannot avail itself of the interest-rate protections under federal law that apply to Cross River Bank's loans. *See* Opp. at 7-10. But the Administrator's argument misunderstands the valid-when-made rule and the legislative landscape surrounding that rule. Section 27's complete preemption applies to "any loan . . . made" by Cross River Bank, even after it is sold to Marlette, and preempts the Administrator's action here.

The Administrator's contention that the "valid-when-made" rule is "irrelevant" here ignores the fundamental importance of that rule in federal banking law. Opp. at 13. When Congress enacted the earliest antecedent to Section 27, in 1864, it was well-established that a bank's power to sell loans was a "necessarily implied" corollary of the power to originate loans. *Planters' Bank of Miss. v. Sharp*, 47 U.S. (6 How.) 301, 322-23 (1848); *see Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828). The Solicitor General confirmed

---

[1] *E.g.*, Press Release, *FDIC Announces Settlement with Bank of Lake Mills, Freedom Stores, Inc., and Military Credit Services, LLC, for Unfair and Deceptive Practices* (May 11, 2017), https://www.fdic.gov/news/news/press/2017/pr17038.html (announcing $3 million penalty against a state-chartered bank for the actions of two of its partners).

the valid-when-made rule's place in federal law, noting that "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." Br. *Amicus Curiae, Midland Funding, LLC*, 2016 WL 2997343, at *8.

The Administrator wrongly contends that the Solicitor General, OCC, and federal courts err by not limiting *Gaither* and *Nichols* to cases where the sale of a loan is itself usurious. Opp. at 13-14. For one, the OCC's views on this matter are entitled to deference, *Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 563 n.7 (9th Cir. 2002), as are the views of other courts, deciding before and after *Gaither* and *Nichols*, that have held that a loan cannot become invalid simply by changing hands. *E.g.*, *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005); *Watkins v. Taylor*, 16 Va. 424, 436 (1811) ("[I]f it was not usury *at the time* when the contract was entered into, no *after* circumstance can make it so."). Moreover, the Administrator's argument defeats itself—if a loan remains valid even if later involved in a *usurious* transaction, then, *a fortiori*, it remains valid when it simply changes hands.

This history also defeats the Administrator's argument that, because Section 27 does not expressly mention non-banks, it excludes any application to loans after they are sold. *See* Opp. at 9. This argument first overlooks that Section 27 applies to "**any** loan or discount **made**" by a bank. 12 U.S.C. § 1831d(a) (emphasis added). When Congress uses the word "any," it "mean[s] what it says." *United States v. Gonzales*, 520 U.S. 1 (1997). And by extending preemption, without qualification, to any loan "made," Section 27 forecloses any judicial gloss that would limit preemption to only those loans that a state-chartered bank continues to hold indefinitely.[2] More fundamentally, Section 27 has

---

[2] Because Section 27 applies to the loan and not just the lender, the Administrator's reliance on cases forbidding the *transfer* of preemption rights in other statutes is misplaced. *See* Opp. at 11 n.4.

to be read in light of the common law background that was entrenched when it was drafted. *See Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*, 501 U.S. 104, 108 (1991). Here, that means that courts must "take it as given" that Section 27's expansive preemption of state interest-rate caps as to "any loan . . . made" incorporates the foundational banking law principle that a loan that is "valid when made" cannot become usurious under the interest rate laws of another jurisdiction after it is sold. *Id.*

The Administrator contends that pending legislation that would codify the valid-when-made rule should be construed as evidence that Section 27 does not already embody that rule. *See* Opp. at 10 & Ex. A. To the contrary, the bill's sponsor introduced the legislation expressly to correct "uncertainty" caused by the "unprecedented" holding in the *Madden* case. Press Release, Patrick McHenry, *McHenry Introduces Fintech Bills* (July 12, 2016); *see Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1216 (10th Cir. 2008) (noting that bills often are introduced "to correct a misinterpretation" by the courts). That the bill was not enacted, moreover, "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft,* 535 U.S. 274, 287 (2002).

Similarly, the Administrator incorrectly contends that the Dodd-Frank Act withdrew preemption for actions like this one. *See* Opp. at 10-11. *First*, Section 25b(h)(2) explicitly does not affect interest rates. A different subsection states that "[n]o provision of [the Act] shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State . . . where the bank is located, including with respect to the meaning of 'interest' under such provision." 12 U.S.C. § 25b(f). *Second*, even if Section 25b(h)(2) did apply to interest rates for the NBA, it would not apply here as Marlette did not extend loans, and asserts preemption under Section 27 as an assignee of Cross

9

River Bank's loans, not as its "subsidiar[y], affiliate[], or agent[]" under the NBA. *Third*, the Administrator admits that Section 25b(h)(2) was enacted to overturn the decision in *Watters v. Wachovia Bank, N.A.,* 550 U.S. 1, 19-21 (2007). But *Watters* involved preemption under Section 24(Seventh) of the NBA of state licensing laws as applied to national bank subsidiaries—it did not involve Section 85 or interest-rate preemption. If Congress had intended to change interest rate preemption by enacting Section 25b(h)(2), it would have amended both the NBA and the FDIA.

Finally, the Administrator's attempt to draw distinctions between state-chartered banks and their national counterparts based on historically disparate treatment by state regulators fails. *See* Opp. at 12-13. Whatever differences may exist as to how banks are regulated, Section 27 requires courts to "prevent discrimination against state-chartered" banks relating to interest rates, 12 U.S.C. § 1831d(a). A state-chartered bank can compete equally with national banks in offering credit nationwide *only* if the loans it makes, like those a national bank makes, remain protected from interest-rate challenges after sale.

## CONCLUSION

For the reasons above and in the Motion, the Amended Complaint should be dismissed.

Respectfully submitted this 31st day of May 2017,

| | |
|---|---|
| **KLENDA GESSLER & BLUE LLC** | **SIDLEY AUSTIN LLP** |
| s/ *Geoffrey N. Blue* | s/ *Mark E. Haddad* |
| Geoffrey N. Blue | Mark E. Haddad |
| Scott E. Gessler | Collin P. Wedel |
| 1624 Market Street, Suite 202 | 555 West Fifth Street, Suite 4000 |
| Denver, CO 80202 | Los Angeles, CA 91107 |
| Telephone: (720) 432-5705 | Telephone: (213) 896-6000 |
| Facsimile: (720) 379-9214 | Facsimile: (213) 896-6600 |
| Email: gblue@klendagesslerblue.com | Email: mhaddad@sidley.com |
| sgessler@klendagesslerblue.com | cwedel@sidley.com |

*Attorneys for Defendant Marlette Funding, LLC*

**Certificate of Service**

I hereby certify that on May 31, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Nikolai N. Frant, Senior Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO  80203

Trina K. Taylor
Assistant Attorney General
Uniform Consumer Credit Code
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado 80203

                _s/Joanna Bila_
                Joanna Bila, Paralegal